IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. |
| | ) | |
| v. | ) | Judge |
| | ) | |
| LIMA REFINING COMPANY, | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

## **NATURE OF ACTION**

1.      This is a civil action brought by the United States against Lima Refining Company ("LRC" or "Defendant"), pursuant to Sections 113(b) and 167 of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7413(b) and 7477, for violations of the CAA at LRC's petroleum refinery located at 1150 South Metcalf Street in Lima, Ohio (the "Lima Refinery").  The United States seeks the assessment of civil penalties and appropriate injunctive relief based on these violations.

1

2.      The United States alleges that LRC has violated and/or continues to violate the following Clean Air Act statutory and regulatory requirements that are applicable to the petroleum refining industry at its Lima Refinery:

1.  New Source Performance Standards ("NSPS") promulgated at 40 C.F.R. Part 60, Subparts A, J, VV, and GGG, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;

2.  National Emission Standards for Hazardous Air Pollutants promulgated at 40 C.F.R. Part 63, Subparts A and CC, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412;

3.  the Ohio state implementation plan ("SIP") which incorporates and/or implements the above-listed federal regulations;

4.  the Permit-to-Install issued pursuant to the SIP by Ohio Environmental Protection Agency ("Ohio EPA"); and

5.  the Lima Refinery Title V permit.

The United States further alleges that LRC has violated and/or continues to violate the Consent Decree Addendum entered by the United States District Court for the Western District of Texas in Civ. No. SA-07-CA-0683-RF on November 20, 2007 (the "2007 Addendum"), which covers three refineries, including the Lima Refinery.

## JURISDICTION, VENUE, AND AUTHORITY

3.      This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 7413(b), 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has personal jurisdiction over the party which does business in the State of Ohio and in this judicial district.

4.      Venue is proper in this District pursuant to 42 U.S.C. § 7413(b), 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395(a), because LRC resides and is doing business within this judicial district at its Lima Refinery, because the actions giving rise to the violations alleged herein occurred in this judicial district, and LRC may otherwise be found in this judicial district.

5.     Authority to bring this action is vested in the United States Department of Justice pursuant to Sections 113(b) and 305 of the CAA, 42 U.S.C. §§ 7413(b) and 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

## NOTICE TO STATE

6.     Notice of the commencement of this action was given to the State of Ohio at least thirty (30) days prior to the filing of this Complaint as required by Sections 113(a)(1) and 113(b) of the CAA, 42 U.S.C. §§ 7413(a)(1) and 7413(b).

7.     On March 20, 2009, EPA issued a Finding of Violation to LRC asserting that the Lima Refinery was in violation of the National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries at 40 C.F.R. Part 63, Subparts CC and A, and its Title V permit by improperly operating one of its refinery flares.  A copy is attached hereto as Exhibit 1 to this Complaint.

8.     On December 17, 2013, EPA issued a Notice and Finding of Violation to LRC asserting the Lima Refinery's alleged non-compliance with various requirements of the following:  (i) Permit-to-Install issued by Ohio Environmental Protection Agency ("Ohio EPA"); (ii) the Ohio State Implementation Plan; (iii) the Lima Refinery Title V permit.  A copy is attached hereto as Exhibit 2 to this Complaint.

## PARTIES

9.     Plaintiff is the United States of America, acting at the request of the United States Environmental Protection Agency ("EPA"), an agency of the United States.

10.     Defendant LRC is and, at all times relevant to the Complaint, has been a corporation incorporated under the laws of the State of Delaware and doing business at the Lima Refinery.

11.     LRC is, and at all times relevant to the Complaint has been, the "owner" and "operator" of the Lima Refinery, within the meaning of Sections 111(a) and 112(a) of the CAA, 42 U.S.C. §§ 7411(a) and 7412(a).

12.     LRC is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e), and applicable federal and state regulations promulgated pursuant to these statutes.

## STATUTORY AND REGULATORY BACKGROUND

### Clean Air Act Requirements

13.     The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

### A.     National Ambient Air Quality Standards (NAAQS)

14.     CAA Section 108(a), 42 U.S.C. § 7408(a), requires the EPA to identify and prepare air quality criteria for each air pollutant, the emissions of which may endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources.  For each such "criteria pollutant," Clean Air Act Section 109, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare.

15.     Pursuant to Clean Air Act Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409, EPA has identified nitrogen oxides (NOx), sulfur dioxide ($SO_2$), volatile organic compounds (VOC), particulate matter (PM), and ozone as criteria pollutants, and has promulgated primary and secondary NAAQS for them at 40 C.F.R. Part 50.

- 4 -

16.     Clean Air Act Section 110, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a state implementation plan ("SIP") that provides for the attainment and maintenance of the NAAQS within the state.

**B.     NEW SOURCE PERFORMANCE STANDARDS**

**1.     General**

17.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those categories that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

18.     Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. §7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a New Source Performance Standard ("NSPS"). Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

19.     "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such sources.  42 U.S.C. § 7411(a)(2).  "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

20.     The New Source Performance Standards are located in Part 60 of Title 40 of the Code of Federal Regulations.

       **2.**      **Part 60, Subpart A:  General**

21.      Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 ("Subpart A").

22.      Under Subpart A, the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1.

23.      "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

       **3.**      **Part 60, Subpart A:  40 C.F.R. § 60.11(d)**

24.      Within Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment.  Specifically, at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.  40 C.F.R. § 60.11(d).

       **4.**      **Part 60, Subpart A:  40 C.F.R. § 60.13(e) (Requirements related to Continuous Monitoring Systems)**

25.      Within Subpart A, EPA promulgated specific regulations that apply to all continuous monitoring systems required under any applicable Subpart.  40 C.F.R. § 60.13.

26.     Of relevance to this complaint, "except for system breakdowns, repairs, calibration checks, and zero and span adjustments required under [another subparagraph of this provision], all continuous monitoring systems shall be in continuous operation."  40 C.F.R. § 60.13(e).

### 5.      Part 60, Subpart A:  40 C.F.R. § 60.18 (Requirements related to Flares Used as Control Devices)

27.     Within Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. §§ 60.18(b)–(f).

28.     Of relevance to this complaint is the requirement that an owner or operator monitor each flare to ensure that it is operated and maintained in conformance with its design, 40 C.F.R. § 60.18(d).

### 6.      Specific NSPS Standards:  Part 60, Subparts J, VV, and GGG

29.     Pursuant to Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA has identified, *inter alia*, the following as categories of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare and EPA has promulgated regulations in the following Subparts of Part 60 of Title 40 of the Code of Federal Regulations to regulate those categories:

| CATEGORY | REGULATION (40 C.F.R. Part 60) |
|---|---|
| Petroleum Refineries | Subpart J 40 C.F.R. §§ 60.100 *et seq.* |
| Equipment Leaks of VOC in Petroleum Refineries (between Jan. 4, 1983, and Nov. 7, 2006) | Subpart GGG 40 C.F.R. §§ 60.590–60.593 |
| Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (between Jan. 5, 1981, and Nov. 7, 2006) | Subpart VV 40 C.F.R. §§ 60.480–60.489 |

30.     Of relevance to this complaint, one of the "affected facilities" that Subpart J applies to is a "fluid catalytic cracking unit catalyst regenerator," 40 C.F.R. § 60.100(a) and (b), which commenced construction, reconstruction, or modification after June 11, 1973.

31.     Of relevance to this compliant, the provisions of 40 C.F.R. Part 60 Subpart J applies to a "fuel gas combustion devices," including flares, 40 C.F.R. § 60.100(b), which commenced construction, reconstruction, or modification after June 11, 1973 and on or before June 24, 2008.

32.     Of relevance to this complaint, the provisions of 40 C.F.R. Part 60 Subpart J also applies to sulfur recovery plants with a capacity greater than twenty (20) long tons per day, 40 C.F.R. § 60.100(a) and (b), which commenced construction or modification after October 4, 1976.

33.     40 C.F.R. § 60.8(a) requires the owner or operator of facilities subject to 40 C.F.R. Subparts A and J to conduct performance test(s) of the affected facility and submit a written report of the performance test results to the EPA by specified deadlines.

34.     40 C.F.R. § 60.103(a) prohibits the discharge or cause the discharge into the atmosphere from any fluid catalytic cracking unit catalyst regenerator any gases that contain CO in excess of 500 ppm by volume (dry basis).

35.     40 C.F.R. § 60.104(a)(1) prohibits the burning in any fuel gas combustion device of any fuel gas that contains hydrogen sulfide ("$H_2S$") in excess of 230 milligrams per dry standard cubic meter, or 0.10 grains per dry standard cubic foot.

36.     40 C.F.R. § 60.104(a)(2) prohibits sulfur recovery plants subject to 40 C.F.R. Part 60, Subpart J with reduction control systems followed by incineration from discharging in excess of 250 ppm by volume (dry basis) of $SO_2$ at zero percent excess air.  40 C.F.R. § 60.104(a)(2)

8

prohibits sulfur recovery plants subject to 40 C.F.R. Part 60, Subpart J with reduction control systems not followed by incineration from discharging in excess of 300 ppm by volume of reduced sulfur compounds and in excess of 10 ppm by volume of $H_2S$, each calculated as ppm $SO_2$ by volume (dry basis) at zero percent excess air.

37.     Pursuant to 40 C.F.R. § 60.105(a)(2), the owner or operator of fluid catalytic cracking unit catalyst regenerators subject to 40 C.F.R. § 60.103(a) must install, calibrate, maintain, and operate a continuous monitoring system to record the concentration by volume of CO emissions into the atmosphere.  The continuous monitor shall include an oxygen monitor for correcting the data for excess air.

38.     Pursuant to 40 C.F.R. § 60.105(a)(1) and (5), the owner or operator of a Claus sulfur recovery plant with oxidation control systems or reduction control systems followed by incineration is required to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis, zero percent excess air) of $SO_2$ emission into the atmosphere.

39.     Pursuant to 40 C.F.R. § 60.105(a)(3), the owner or operator of fuel gas combustion devices subject to 40 C.F.R. § 60.104(a)(1) must install, calibrate, maintain, and operate a continuous monitoring system to record the concentration by volume of $SO_2$ emissions into the atmosphere.  The continuous monitor shall include an oxygen monitor for correcting the data for excess air.

40.     As an alternative to 40 C.F.R. § 60.105(a)(3), pursuant to 40 C.F.R.§ 60.105(a)(4), the owner or operator of fuel gas combustion devices subject to 40 C.F.R. § 60.104(a)(1) may install, calibrate, maintain, and operate an instrument for continuously

9

monitoring and recording the concentration (dry basis) of $H_2S$ in fuel gases before being burned in an affected fuel gas combustion device.

41.     Pursuant to 40 C.F.R. § 60.105(a)(9) and (10), the owner or operator of a fluid catalytic cracking unit catalyst regenerators subject to 40 C.F.R. § 60.104(b)(1) must install an instrument for continuous monitoring and recording concentration of $SO_2$ in the gases discharged into the atmosphere from any fluid catalytic cracking unit catalyst regenerators.

42.     Section 111(e) of the CAA, 42 U.S.C. § 7411(e), and 40 C.F.R. Part 60 prohibits the operation of any new source in violation of an NSPS applicable to such source.

43.     Of relevance to this complaint, the affected facilities that Subpart GGG applies to are compressors and all "equipment" within a process unit at a petroleum refinery. 40 C.F.R. § 60.590(a). "Equipment" means each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service. 40 C.F.R. § 60.591.

44.     In all respects relevant to this complaint, each owner or operator of a petroleum refinery that is subject to the requirements of Subpart GGG is required to comply with the standards of Subpart VV. 40 C.F.R. §§ 60.592.

45.     Of relevance to this complaint, the affected facilities that Subpart VV applies to are all "equipment" within a process unit at a synthetic organic chemicals manufacturing facility. 40 C.F.R. §§ 60.480(a)(2). "Equipment" means each pump, compressor, sampling connection system, open-ended valve or line, valve, and flange or other connector in VOC service. 40 C.F.R. §§ 60.481, 60.481a.

46.     Under Subpart VV—and therefore, under GGG—each owner or operator who uses a flare as a control device to comply with the requirements of Subpart VV must also comply with the requirements of 40 C.F.R. § 60.18.  40 C.F.R. §§ 60.482-10(d).

47.     Under Subpart VV—and therefore, under GGG—each owner or operator of any control device used to comply with the requirements of Subpart VV must monitor the control device to ensure that it is operated and maintained in conformance with its design. 40 C.F.R. § 60.482-10(e).

## C.     NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS

### 1.     General:  Section 112

48.     Section 112 of the Clean Air Act sets forth a national program for the control of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412.  As originally promulgated in the Clean Air Act Amendments of 1970, Section 112 directed EPA to publish a list of HAPs.  A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness."  42 U.S.C. § 1857c-7 (1971).  At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant."  Id.

49.     Between 1970 and 1990, EPA listed eight substances as hazardous air pollutants and promulgated emission standards for seven of them.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 151 (1990).

50.     Through the Clean Air Act Amendments of 1990, Congress replaced the then-existing Section 112 and established a new program for the control of HAPs.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 324 (1990).

51.     With the 1990 amendments, Congress itself established a list of 188 hazardous air pollutants believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

52.     Congress directed EPA to publish a list of all categories and subcategories of, inter alia, major sources of HAPs.  42 U.S.C. § 7412(c).

53.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

54.     "Stationary source" was and is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

55.     A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  Id.

56.     Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, inter alia, major sources of HAPs.  42 U.S.C. § 7412(d)(1). These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emission reduction,

12

and any non-air quality health and environmental impacts and energy requirements, determines

is achievable for the new or existing sources in the category or subcategory to which the

emission standard applies.  42 U.S.C. § 7412(d)(2).

57.     To the extent that it is not feasible to prescribe or enforce an emission standard for

the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work

practice, or operational" standards, which are to be treated as emission standards.

42 U.S.C. § 7412(h).

58.     The emission standards promulgated under Section 112 of the 1990 Amendments

of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air

Pollutants ("NESHAPs") for Source Categories or "MACT" ("maximum achievable control

technology") standards.  These emission standards are found in Part 63 of Title 40 of the Code of

Federal Regulations.

59.     After the effective date of any emission standard, limitation, or regulation

promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of

such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

**2.     Part 63, Subpart A:  General**

60.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, as it existed after the 1990

CAA Amendments, EPA promulgated regulations that contain general provisions applicable to

sources that are subject to the MACT standards of Part 63 of Title 40 of the Code of Federal

Regulations.  40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16 ("Subpart A").

61.     Under Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or

operator of any stationary source that (i) emits or has the potential to emit any hazardous air

pollutant listed in or pursuant to Section 112(b) of the Act; and (ii) is subject to any standard,

13

limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b).

62.     Under Subpart A, each relevant standard in Part 63 must identify explicitly whether each provision in Subpart A is or is not included in such relevant standard. 40 C.F.R. § 63.1(a)(4)(i).

### 3.     Part 63 Subpart A:  40 C.F.R. § 63.6(e)(1)(i)

63.     Within Subpart A of Part 63, EPA promulgated a requirement that corresponds to the "good air pollution control practices" requirement of Subpart A of the NSPS (*i.e.* 40 C.F.R. § 60.11(d)).  Specifically, at all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.  40 C.F.R. § 63.6(e)(1)(i).

### 5.     Specific MACT Standards:  Part 63, Subpart CC

64.     Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified petroleum refineries as a source category of HAPs.  57 Fed. Reg. 31,576, 31,591 (Table 1) (July 16, 1992).

65.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries.  60 Fed. Reg. 43,260 (August 18, 1995).  These standards are commonly referred to as the "Refinery MACT" and are found at 40 C.F.R. Part 63, Subpart CC, §§ 63.640–63.656 and associated Tables.

66.     Of relevance to this complaint, the affected sources that Subpart CC applies to are all "miscellaneous process vents" and "equipment leaks" from petroleum refining process units that are located at a plant site that is a major source and that emit or have equipment containing or contacting one or more of the HAPs listed in a table associated with Subpart CC.  40 C.F.R. §§ 63.640(c)(1) and (c)(4).

67.     Under Subpart CC, owners and operators must comply with the equipment leak provisions of Subpart VV, which requires compliance with 40 C.F.R. §§ 60.18 and 63.648(a).

68.     40 C.F.R. § 60.18(d) requires owners and operators of existing flares to monitor them to ensure they are operated and maintained in conformance with their designs.

69.     Pursuant to Table 6 of Subpart CC, prior to February 1, 2016, with certain exceptions that are not applicable here, owners or operators of affected facilities under Subpart CC are required to comply with 40 C.F.R. § 63.6(e), including 40 C.F.R. § 63.6(e)(1)(i) as described in paragraph 63.

### C.     CAA Title V Program

70.     Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for certain sources, including major sources, sources subject to Sections 111 (NSPS program) or 112 (NESHAP/MACT program) of the CAA, or any source required to have a PSD or Nonattainment NSR Permit.  42 U.S.C. § 7661a(a).  The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including SIP requirements, are collected in one permit.  42 U.S.C. § 7661c(a).

71.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of

a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

72.     EPA fully approved the Ohio Title V Permit program effective October 1, 1995. 60 Fed. Reg. 42,045 (August 15, 1995).  Ohio's Title V Permit program requirements are codified at OAC Rule 3745-77.  Ohio is authorized to issue and enforce Title V permits.  In all respects relevant to this Complaint, the Title V regulations of Ohio closely mirror the federal Title V regulations codified at 40 C.F.R. Part 70.

73.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a)) and the Title V permit program and regulations of Ohio provide that, after the effective date of the state Title V permit program, no person may violate any requirement of a Title V permit.

74.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a)), the implementing regulations at 40 C.F.R. §§ 70.1(b) and 70.7(b), and the Title V permit program and regulations of Ohio provide that, after the effective date of the state Title V permit program, no source subject to Title V may operate except in compliance with a Title V permit.

75.     Section 503(c) of the CAA (42 U.S.C. § 7661b(c)), the implementing regulations at 40 C.F.R. § 70.5(a), and the Title V permit program and regulations of Ohio provide that each owner and operator of a source subject to Title V permitting requirements must submit a permit application.  Among other things, the permit application must contain:  (i) information sufficient to determine all applicable air pollution control requirements (including any requirement to comply with the applicable NSPS and/or NESHAP/MACT standards), 40 C.F.R. § 70.5(c)(4); (ii) information that may be necessary to determine the applicability of other applicable requirements of the CAA, 40 C.F.R. § 70.5(c)(5); (iii) a compliance plan for all applicable requirements for which the source is not in compliance, 42 U.S.C. § 7661b(b), 40 C.F.R. §

16

70.5(c)(8); and (iv) a certification of compliance with all applicable requirements by a responsible official.  40 C.F.R. § 70.5(c)(9).

76.     Under 40 C.F.R. § 70.5(b) and the Title V permit program and regulations of Ohio, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

77.     Section 504(a) of the CAA (42 U.S.C. § 7661c(a)), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Title V permit programs and regulations of Ohio requires each Title V permit to include, inter alia, enforceable emission limitations and standards, a schedule of compliance, and such other conditions as are necessary to assure compliance with all applicable requirements of the CAA, including the requirements of the applicable SIP.

78.     All terms and conditions of a Title V permit are enforceable by EPA.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

**D.     Enforcement of the CAA**

79.     Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of a SIP, the NSPS program, the NESHAP/MACT program, the Title V permit program, or a Title V permit.

80.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

81.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.

17

82.     The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 et seq., as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 et seq., requires EPA to periodically adjust its civil penalties for inflation.  On December 31, 1996, February 13, 2004, and December 11, 2008, November 6, 2013, and January 12, 2017, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA.  For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $27,500 per day may be assessed; for each violation that occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be assessed; for each violation that occurs on and after January 13, 2009 through November 2, 2015 penalties of up to $37,500 per day may be assessed; and for each violation that occurs after November 2, 2015, penalties of up to $95,284 per day may be assessed.  60 Fed. Reg. 69,360 (Dec. 31, 1996); 60 Fed. Reg. 7121 (Feb. 12, 2004); 73 Fed. Reg. 75,340 (Dec. 11, 2008); 78 Fed. Reg. 66,643 ((November 6, 2013); and 82 Fed. Reg. 3633 (January 12, 2017).

## GENERAL ALLEGATIONS

83.     At all times relevant herein, LRC has owned and operated the Lima Refinery, a petroleum refinery within the meaning of 42 U.S.C. §§ 7479(1), 7612(a)(9), and 7661(2), and within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(a) and 40 C.F.R. § 70.2.

84.     At all times relevant herein, the Lima Refinery has emitted or had the potential to emit at least 100 TPY of NOx, SO2, CO, PM (including PM10 and PM2.5), and VOCs.

85.     At all times relevant herein, the Lima Refinery has been a "major source," as defined by 42 U.S.C. § 7412(a)(1), 42 U.S.C. § 7661(2), and 40 C.F.R. § 70.2.

18

86.     At relevant times, the Lima Refinery has been an "affected facility," and has contained individual "affected facilities," that are subject to regulation pursuant to 40 C.F.R. Part 60, Subparts A and J.

87.     At relevant times, the Lima Refinery has been an "affected facility," and has contained individual "affected facilities," that are subject to regulation pursuant to 40 C.F.R. Part 60, Subpart VV and Subpart GGG.

88.     At all times relevant herein, the Lima Refinery has been an "affected facility," and has contained individual "affected facilities," that are subject to regulation pursuant to 40 C.F.R. Part 63, Subparts CC.

89.     At all times relevant herein, the Lima Refinery has been subject to the Title V permitting requirements contained in 40 C.F.R. Part 70 and the Ohio SIP.

90.     LRC is the "owner or operator," within the meaning of the CAA, of the Lima Refinery.

91.     The Lima Refinery is a "source," a "stationary source," a "major stationary source," and a "major source" within the meaning of the CAA, the NSPS program and regulations, the NESHAP/MACT program and regulations, the Title V program and regulations, and the Ohio SIP that adopts, incorporates, and/or implements these programs and regulations.

92.     The Lima Refinery has a Title V permit that has been issued by the State of Ohio.

93.     LRC owns and operates, inter alia, the following units at the Lima Refinery:  a sulfur recovery plant ("SRP") designed to handle 110 long tons per day ("LTPD") of sulfur, and various heaters and boilers that constitute fuel gas combustion devices.

94.     LRC owns and operates two steam-assisted flares identified as P006 and P007.

19

95.     A flare is a combustion device that uses an uncontrolled volume of ambient air to burn gases.

96.     A steam-assisted flare is a flare that utilizes steam piped to the flare tip to assist in combustion.

## FIRST CLAIM FOR RELIEF

**(Failure to Comply with Specified Equipment Leak Requirements in Violation of NSPS Subpart GGG and VV; Violation of Title V Permit)**

97.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 96 as if fully set forth herein.

98.     LRC owns and operates the following process units at the Lima Refinery:  C3 Splitter, Gasoline Desulfurization, Isomerization, Boilerhouse, Diesel Hydrotreater (DHT), Ultraformer, Coker, Sat Gas, Catalytic Kerosene Hydrotreating (KHT), Fluid Catalytic Cracking (FCC), Sulfur Recovery Unit (SRU), and Flare Gas Recovery (FGR).

99.     At all times relevant to this Claim, each of the above-referenced units was subject to the NSPS for Equipment Leaks of VOC in Petroleum Refineries at 40 C.F.R. Part 60, Subpart GGG ("Subpart GGG").  Subpart GGG is found at 40 C.F.R. §§ 60.590–60.593.

100.    In relevant part, Subpart GGG requires facilities that are subject to Subpart GGG to comply with 40 C.F.R. Part 60, Subpart VV ("Subpart VV").  40 C.F.R. § 60.592.  Subpart VV is found at 40 C.F.R. §§ 60.480–60.489.

101.    With certain exceptions not relevant here, Subpart VV requires each open-ended valve or line ("OEL") to be equipped with a cap, blind flange, plug, or second valve.  40 C.F.R. § 60.482-6(a)(1).

102.     Audits conducted in August 2010, September 2012, September – October 2014, and August 2016 show that from approximately August 2008 through August 2016, LRC failed to equip 32, 35, 26, and 5, respectively, open-ended lines in the C3 Splitter, Gasoline Desulfurization, Isomerization, Boilerhouse, DHT, Ultraformer, Coker, Sat Gas, KHT, FCC, SRU, and FGR with a cap, blind flange, plug, or second valve, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulation at 40 C.F.R. § 60.482-6(a)(1).

103.     Subpart VV requires an owner/operator to record the identification numbers for equipment that is subject to Subpart VV.  40 C.F.R. § 60.486(e)(1).  For each valve and pump subject to Subpart VV, the owner/operator must undertake periodic monitoring and follow up monitoring to detect leaks. Id. §§ 60.482-7(a),(c) (valves); 60.482-2(a) (pumps).

104.     Audits conducted in August 2010, September 2012, September – October 2014, and August 2016 show that from approximately August 2008 through August 2016, LRC failed to tag and record the identification number of 136, 38, 87, and 51, respectively, pieces of equipment in C3 Splitter, Gasoline Desulfurization, Isomerization, Boilerhouse, DHT, Ultraformer, Coker, Sat Gas, KHT, FCC, SRU, and FGR, and failed to periodically monitor these pieces of equipment, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulations at 40 C.F.R. §§ 60.486(e)(1); 60.482-7(a)(1); 60.482-2(a)(1).

105.     Audits conducted in September 2012, September – October 2014, and August 2016 show that from approximately September 2010 – August 2016, LRC failed to conduct timely monitoring of all potential leak interfaces at Boilerhouse, DHT, Ultraformer, Coker, Sat Gas, KHT, FCC, SRU, and FGR units, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulation at 40 C.F.R. § 60.482-7(a - c).  Subpart VV requires each owner/operator to comply with the monitoring procedures and requirements of Method 21

21

at 40 C.F.R. Part 60, Appendix A.  40 C.F.R. § 60.485(b)(1).  In turn, Method 21, at 40 C.F.R.

Part 60, Appendix A-7, Meth.21, Section 8.3.1, requires the owner or operator of an affected

source to do as follows:

> Place the probe inlet [of the portable instrument that is capable of
> detecting emissions from equipment] at the surface of the component interface
> where leakage could occur.  Move the probe along the interface periphery while
> observing the instrument readout.  If an increased meter reading is observed,
> slowly sample the interface where leakage is indicated until the maximum meter
> reading is obtained.  Leave the probe inlet at this maximum reading location for
> approximately two times the instrument response time.  If the maximum observed
> meter reading is greater than the leak definition in the applicable regulation,
> record and report the results [as a leaking component].

106.    Audits conducted in August 2010, September 2012, and September – October

2014 show that from approximately August 2008 through October 2014, LRC failed to perform

Method 21 correctly, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the

implementing regulations at 40 C.F.R. § 60.485(b)(1) and Section 8.3.1 of Method 21 of

Appendix A-7 of 40 C.F.R. Part 60.

107.    The acts and omissions identified in this Claim also constitute violations of those

provisions of the Lima Refinery's Title V permit that require compliance with the NSPS

provisions identified in this Claim; the prohibitions against violating the terms of a Title V

permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions

found in the federally enforceable Ohio Title V program that correspond to the prohibitions in 42

U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

108.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA,

42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, LRC is subject to civil

penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15,

2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009;

up to $37,500 per day for each violation after January 13, 2009 through November 2, 2015; and

up to $95,284 per day for each violation after November 2, 2015.

## SECOND CLAIM FOR RELIEF

**(Violation of NSPS Subparts A and J Requirements related to CEMS and Emissions Standards and LRC's Title V Permit that Incorporates these Requirements)**

109.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 108 as if fully set forth herein.

110.    LRC owns and operates continuous emissions monitoring systems (CEMS) at various process units at the Lima Refinery that are subject to the requirements of 40 C.F.R. Subparts A and J.

111.    On numerous occasions between 2010 and 2015, LRC failed to comply with the requirement in 40 C.F.R. § 60.13(e) to continuously operate the CEMS on the following units, except for periods of system breakdowns, repairs, calibration checks, and zero and span adjustments: (1) $SO_2$ monitoring at the FCC/CO Boiler and (2) $H_2S$ monitoring at twelve boilers.

112.    On numerous occasions between 2010 and 2014, LRC failed to continuously monitor and record either the concentration of $SO_2$ emissions into the atmosphere from the FCC/CO Boiler, as required by 40 C.F.R. § 60.105(a)(9) and (10).

113.    On numerous occasions between 2010 and 2015, LRC failed to continuously monitor and record either the concentration of $SO_2$ emissions into the atmosphere from, or the concentration of $H_2S$, in fuel gases before being burned in, the heaters and boilers associated with the East Side Fuel Gas Unit (B009, B016, B026, B027, and B028) (each of which monitors a heater and/or boiler that is used to combust refinery fuel gas) in accordance with 40 C.F.R. § 60.105(a)(3) or (a)(4).

114.    On numerous occasions from 2010 to 2014, LRC failed to comply with the CO emission standard at the FCC/CO Boiler (P010), in violations of 40 C.F.R. § 60.103(a).

115.    On numerous occasions from 2010 to 2014, LRC failed to comply with the $SO_2$ emission standard at the Sulfur Recovery Unit ("SRU")/Tail Gas Treatment Unit ("TGTU"), and Butane-Butylene Treater ("BB Treater"), in violations of 40 C.F.R.§ 60.104(a)(2)(i).

116.    Unless restrained by an Order of the Court, these violations of the CAA and the implementing regulations will continue.

117.    The acts and/or omissions identified in this Claim constitute violations of:

(a)  Section 111 of the CAA, 42 U.S.C. § 7411;

(b)  Regulations implementing Section 111 at 40 C.F.R. §§ 60.13(e), 60.105(a)(2), 60.105(a)(4), 60.103(a), 60.104(a)(2)(i);

(c)  Those provisions of the Lima Refinery's Title V Permit that require compliance with 40 C.F.R. §§ 60.13(e), 60.105(a)(2), 60.105(a)(4), 60.103(a), 60.104(a)(2)(i); and

(d)  The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

118.    As a result of its violations, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), as amended, LRC is liable for injunctive relief and the assessment of a civil penalty of up to $27,500 per day for each violation occurring between January 31, 1997 and March 15, 2004, up to $32,500 per day for each violation occurring between March 15, 2004 and January 12, 2009; and up to $37,500 per day for each violation after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each violation after November 2, 2015.

## THIRD CLAIM FOR RELIEF

### (Failure to Operate Flares in a Manner Consistent with Good Air Pollution Control Practices in Violation of NESHAP Part 63 Subpart A and LRC's Title V Permit)

119.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 118 as if fully set forth herein.

120.    At all times relevant to this complaint, LRC's P006 and P007 flares were subject to the requirements of 40 C.F.R. § 63.6(e)(1)(i), which requires, at all times, including periods of startup, shutdown, and malfunction, to the extent practicablethe maintenance and operations of its flares in a manner consistent with good air pollution control practice for minimizing emissions.

121.    Good air pollution control practices for minimizing emissions at flares involve, inter alia, combusting essentially all molecules of hydrogen sulfide, hydrocarbons, and hazardous air pollutants ("HAPs") in the gases sent to the flares by ensuring that they have sufficient heating value and oxygen to allow for complete combustion.  For steam-assisted flares (LRC's P006 and P007 flares are steam-assisted), good air pollution control practices for minimizing emissions also involve, inter alia, injecting steam at a rate that maximizes flame stability and flare combustion efficiency.

122.    In order to ensure that the gases sent to flares have sufficient heating value to ensure complete combustion, good air pollution control practices for minimizing emissions at flares involve, inter alia, monitoring, measuring, and/or calculating the net heating value ("NHV") of the gases in the combustion zone ("Combustion Zone Gas") of a flare.  In addition, supplemental gas must be immediately available for addition to the gas being sent to the flare

(the "Vent Gas") to ensure that the NHV of the Combustion Zone Gas is maintained at a level that ensures adequate flare combustion efficiency.

123.    In order to inject steam at a proper rate, good air pollution control practices for minimizing emissions at steam-assisted flares involve, inter alia, monitoring the Vent Gas flow rate and steam flow rate to the flare, calculating the ratio of the Vent Gas flow rate to the steam flow rate ("S/VG"), and having sufficient controls on the steam flow rate to enable increasing or decreasing it in order to optimize S/VG to minimize emissions.

124.    On numerous occasions from at least 2008 through 2015, LRC operated its P006 and P007 flares with an excessively high S/VG.  This excessively high S/VG increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions of uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and CO.

125.    From at least 2008 through 2015, LRC failed to install, or failed to utilize properly, Vent Gas flow monitors and steam flow monitors at both its P006 and P007 flares; failed to calculate S/VG at both its P006 and P007 flares; and failed to have sufficient controls on steam flow to maintain an S/VG that minimized emissions at both its P006 and P007 flares.

126.    From at least 2008 through 2015, LRC failed to have, or failed to utilize, any equipment or monitoring system at its flares to enable LRC to calculate the NHV in the Combustion Zone Gas of both its P006 and P007 flares.  In addition, LRC failed to have supplemental gas immediately available for addition to the Vent Gas.

127.    LRC's operation of its P006 and P007 flares with an insufficient NHV in the Combustion Zone Gas, without monitoring the NHV in the Combustion Zone Gas, without supplemental gas immediately available, with excessively high Steam-to-Vent-Gas ratios, without any (or without sufficient) monitors to measure and calculate S/VG, and without

26

sufficient controls on its steam to optimize the steam injection rate violated the requirement to operate the flares in a manner consistent with good air pollution control practices for minimizing emissions.

128.    The acts and omissions identified in this Claim constitute violations:

(a)    Section 112 of the CAA, 42 U.S.C. § 7412;

(b)    Regulations implementing Section 112 at 40 C.F.R. § 63.6(e);

(c)    Those provisions of Lima Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs (a)–(b);

(d)    The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b.

129.    Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

130.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, LRC is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; up to $37,500 per day for each violation after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each violation after November 2, 2015.

## FOURTH CLAIM FOR RELIEF

**(Failure to Monitor Flares to Ensure that They Are Operated and Maintained in Conformance with their Design in Violation of NESHAP Subpart CC, NSPS Subparts A and VV; and LRC's Title V Permit that Incorporate this Requirement)**

131.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 130 as if fully set forth herein.

132.    LRC's P006 and P007 flares are each subject to the requirements of 40 C.F.R. § 60.18(d).  Under this provision, LRC was and is required to monitor each flare to ensure that it is operated and maintained in conformance with its design.  Flares are designed, in part, to achieve high combustion efficiency of VOCs.

133.    As part of its design, a steam-assisted flare must be operated within a range of Steam-to-Vent-Gas ratios that, on the one hand, avoids smoking through an insufficient S/VG, and, on the other hand, avoids excessive S/VG.  Both insufficient and excessive S/VG reduce VOC combustion efficiency below a flare's designed efficiency.

134.    In order to operate a steam-assisted flare in conformance with its design, the Vent Gas flow to the flare must be monitored; the steam flow to the flare must be monitored; the ratio of the Vent Gas flow to steam flow must be calculated; and the steam flow must be subject to sufficient control to enable increasing or decreasing it in order to maintain a design-appropriate S/VG and a high VOC combustion efficiency consistent with design parameters.

135.    From 2008 to 2015, for the P006 and P007 flares, LRC failed to install and/or properly operate Vent Gas flow monitors and steam flow monitors; failed to calculate Steam-to-Vent-Gas ratios; and failed to have sufficient controls on steam flow to maintain Steam-to-Vent-Gas ratios within design parameters.

28

136.    The acts and omissions identified in this Claim constitute violations of:

(a)    Section 112 of the CAA, 42 U.S.C. § 7412

(b)    Regulations implementing Section 112 at 40 C.F.R. § 60.18(d);

(c)    Regulations implementing Section 111 at 40 C.F.R. §60.482-10(d) (the relevant provision of NSPS SubpartVV) insofar as it relates to flares and require compliance with NESHAP Subpart CC

(d)    Those provisions of Lima Refinery's Title V Permit that requires compliance with the statutory and regulatory requirements identified in Subparagraphs  (a)–(c);

(e)    The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

137.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, LRC is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; up to $37,500 per day for each violation after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each violation after November 2, 2015.

## FIFTH CLAIM FOR RELIEF

### (Failure to Operate the Sulfur Recovery Plant in a Manner Consistent with Good Air Pollution Control Practices in Violation of NSPS Subpart A)

138.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 137 as if fully set forth herein.  The Lima Refinery sulfur recovery plant (SRP) includes, but is not limited to, two sulfur recovery units, two sulfur pits, a joint tail gas unit, and a joint tail gas incinerator. The SRP has a design capacity for sulfur feed of more than twenty long tons per day and is a "Claus sulfur recovery plant" within the meaning of 40 C.F.R. § 60.101(i), which was

constructed, reconstructed, or modified between October 4, 1976, and May 14, 2007, within the

meaning of 40 C.F.R. §§ 60.2 and 60.100(b). As such, the SRP is an "affected facility" at a

"stationary source" and "petroleum refinery" within the meaning of 40 C.F.R. §§ 60.1, 60.2,

60.100(a), 60.101(a), and subject to the requirements of NSPS Subparts A and J, 40 C.F.R. §§

60.1 *et seq.* and 60.100 *et seq.*

139.    Under 40 C.F.R. § 60.11(d) (found in Subpart A), LRC was and is required, at all

times, including periods of startup, shutdown, and malfunction, to the extent practicable, to

maintain and operate its sulfur recovery plant in a manner consistent with good air pollution

control practice for minimizing emissions.

140.    Good air pollution control practices for minimizing emissions at sulfur recovery

plants involve, *inter alia*, diagnosing and preventing root causes of contamination or upsets in

upstream process units; maintaining adequate capacity at the back end of the refinery to process

acid gas, continuously operating the sulfur recovery plant between scheduled maintenance

turnarounds; operating in accordance with the plans required by paragraph 229 of the 2007

Addendum: sulfur shedding procedures, startup and shutdown procedures, hot standby

procedures, emergency procedures; and coordinating maintenance turnarounds of the SRP Claus

trains and any supplemental control devices with scheduled turnarounds of major upstream

process units.

141.    On numerous occasions from at least 2007 through 2016, LRC sent acid gas from

the sulfur recovery plant to the acid gas flaring device that resulted in the emission of $SO_2$ equal

to, or greater than five hundred (500) pounds in a twenty-four (24) hour period and sent tail gas

into a thermal incinerator and resulted in excess emissions of 500 pounds of $SO_2$ in a twenty-four

(24) hour period. LRC failed to diagnose and prevent root causes of contamination or upsets in

upstream process units; maintain adequate capacity at the back end of the refinery to process acid gas; continuously operate the sulfur recovery plant between scheduled maintenance turnarounds; and coordinate maintenance turnarounds of the SRP Claus trains and any supplemental control devices with scheduled turnarounds of major upstream process units.

142. The acts and omissions identified in this Claim constitute violations:

(a) Section 111 of the CAA, 42 U.S.C. § 7411;

(b) Regulations implementing Section 111 at 40 C.F.R. § 60.11(d);

(c) Those provisions of Lima Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs (a)–(b);

(d) The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

143. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

144. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, LRC is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; up to $37,500 per day for each violation after January 13, 2009 through November 2, 2015; and up to $95,284 per day for each violation after November 2, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States, respectfully requests that this Court:

1. Order LRC to immediately comply with the statutory and regulatory requirements cited in this Complaint under the Clean Air Act;

2.      Order LRC to take appropriate measures to mitigate the effects of its violations;

3.      Award the United States civil penalties of up to $27,500 per day for each of LRC's violations occurring on or before March 15, 2004, up to $32,500 per day for each violation occurring between March 16, 2004 and January 11, 2009, up to $37,500 per day for each violation occurring after January 11, 2009, and up to $95,284 per day for each violation occurring after November 2, 2015;

4.      Award the United States its costs and expenses incurred in this action; and

5.      Grant such other and further relief as may be just and proper and as the public interest and the equities of the case may require.

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

s/ Susan M. Akers
SUSAN M. AKERS
Assistant Section Chief
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4831
(202) 616-6584 (Fax)
Susan.Akers@usdoj.gov

DAVID A. SIERLEJA
Acting United States Attorney
Northern District of Ohio


GUILLERMO J. ROJAS
Assistant United States Attorney
Toledo Branch Office
Four Seagate, Third Floor
Toledo, OH 43604


Attorneys for the United States


OF COUNSEL:

WILLIAM WAGNER
MARY McAULIFFE
Associate Regional Counsels
United States Environmental Protection Agency
Region 5
Chicago, Illinois  60604

33